# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 15, 2022

Lyle W. Cayce
Clerk

No. 21-11087

AMY PICKETT,

*Plaintiff—Appellee*,

*versus*

TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER;
BARBARA CHERRY,
*individually and in her official capacity as Department Chair of Leadership Studies*;
MICHAEL EVANS,
*individually and in his official capacity as Dean of School of Nursing*,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Northern District of Texas
No. 5:20-CV-232

Before SMITH, WIENER, and SOUTHWICK, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

The defendants dismissed Amy Pickett from two graduate nursing-studies programs. She sued, claiming that her dismissal violated the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and the Due Process Clause. The district court refused to dismiss some of her claims.

No. 21-11087

The defendants appeal part of that order, contending that they have sovereign immunity from Pickett's ADA claims and that she failed to state Fourteenth Amendment claims. We dismiss their appeal in part because we lack appellate jurisdiction over the Fourteenth Amendment claims. We affirm the order in part and reverse the order in part because we conclude that Pickett stated some Title II claims but not all of the claims that the district court refused to dismiss. The defendants are not entitled to sovereign immunity at this stage of the litigation because Pickett's allegations do not permit us to assume that the defendants did not violate her due-process rights. And the question whether the Due Process Clause protects any of her interests is not properly before this court.

I.

This appeal follows the district court's partial denial of the defendants' motion to dismiss for want of subject-matter jurisdiction and for failure to state a claim. As we will explain,[1] this procedural posture requires us to consider only whether Pickett has plausibly pleaded a claim for which the federal courts have subject-matter jurisdiction. So the following account is drawn from Pickett's complaint.

A.

Pickett was a graduate nursing student at the Texas Tech University Health Sciences Center ("the Center"), which accepted Pickett into its Doctor of Nursing Practice ("DNP") Program in 2016. That program is taught "primarily online" and aims to serve working nurses.

Pickett experienced early success in the DNP Program. A short time later, she decided to enroll in a second post-master's nursing program at the

---

[1] *Infra* Section III.A.

No. 21-11087

Center—the Family Nurse Practitioner ("FNP") Program.  The DNP and FNP Programs are "separate and distinct."  They have different admissions processes, requirements, coursework, and timelines.

Pickett has ADHD.  She knew that the additional demands of the FNP Program might be overwhelming, given her condition and her existing commitments to her job and the DNP Program.  Therefore, when she was accepted into the FNP Program, she decided, for the first time, to seek academic accommodations.

The Center processes requests for academic accommodations via its ADA office.  Students must petition the office for accommodations.  That office decides whether a petitioning student has a qualifying disability.  If he does, the office determines the accommodations to which he is entitled.  It notifies the student of its decision by issuing a "Letter of Accommodation" ("LOA").  To receive the accommodation, however, the student must present that letter to his professors and  must renew his request for an LOA each semester to continue getting accommodations.

Pickett petitioned the Center's ADA office for accommodations in May 2017.  She "noted the impact of [her] ADHD on [her] ability to focus and complete academic tasks under time limited conditions such as testing."

The Center agreed that Pickett had a qualifying disability.  It issued her an LOA including three accommodations: (1) extra time to take tests; (2) a private, quieter testing facility; and (3) note-taking assistance, which included copies of professors' lecture notes and presentations.

In the Fall 2017 semester, Pickett presented her LOA to the FNP Program faculty but not the DNP Program faculty.  She received all of the accommodations that she requested.  She earned a 4.0 GPA.

In the Spring 2018 semester, Pickett renewed her LOA and again pre-

sented it only to her FNP Program professors. She did nearly as well, earning an "A" and a "B."

Trouble arose in the Summer 2018 semester. Pickett renewed her LOA again. But this time, she also presented it to her DNP Program professors. She hesitated to do that because she feared "negative reactions" from them. But she felt as though she had no choice because her health had deteriorated.

After Pickett requested accommodations from her DNP Program professors, she noticed "negative reactions and hostility." For instance, Pickett was required to spend a certain number of hours doing clinical work to satisfy a course requirement. Pickett was timely "completing and reporting those hours." But the Center "questioned" her reports.

DNP Program faculty also failed to provide some of the accommodations listed in Pickett's LOA. On "numerous instances," she did not receive "copies of lecture notes" and in-class presentations even though that was required by her LOA and she had "repeatedly requested" them.

Pickett also had difficulty working with her DNP Program advisor. Those advisors typically review student work before it is submitted. When they do so, they create a timeline for each student based on that student's "needs." Pickett's advisor asked to review each assignment one week before Pickett was required to submit it for grading. She explained that the one-week-before-submission deadline did not leave her with enough time to complete the work. She showed her advisor that semester's LOA and said she "required more time due to [her] disability." The advisor nevertheless refused to accommodate her by moving back the deadlines.

After that incident, Pickett began receiving poorer grades in her DNP Program courses. She was "graded more harshly" and "under different standards" from the other students despite having "previously earned As."

Around the same time, Pickett had surgery. That surgery prevented her from working—and the Center was also her employer. The Center approved her for FMLA leave, so its administration knew that she would temporarily be unable to record clinical hours. While she was on leave, the Center accused her of "falsifying" her reports of the clinical hours that she earlier had worked. The Center held a hearing, and there Pickett proved that her reports were accurate. The Center took no action.

Pickett's surgery also prevented her from completing coursework in the Summer 2018 semester. She asked to receive the grade "Incomplete" in one of her DNP Program courses. She attributed the request to her "increasing ADHD and related anxiety." The Center agreed and directed her to submit a paper for that course by September 2018.

Pickett failed to meet that extended deadline by 30 hours. That's because she faced the "additional demands" of her Fall 2018 semester coursework on top of the postponed paper and was experiencing "exacerbated symptoms." The course's syllabus provided that a paper submitted one day late would be penalized by reducing its grade by one letter. Nevertheless, the course's instructor "immediately" assigned the paper zero points. That instructor said the paper was assigned a zero because it was submitted late. So Pickett failed the course.

Pickett appealed that failure. The Center gave her partial relief. It announced that though her paper would be regraded, she could not receive a grade higher than 79 points—a two-letter-grade reduction—because that was the Center's interpretation of the syllabus's policy.

In response, Pickett's professor re-graded the paper. But she again assigned the paper zero points. This time, the professor explained that the paper was worth zero points because Pickett had failed to incorporate feedback from two faculty members who had previously reviewed the paper.

Pickett appealed again.  Again, the Center split the baby.  It directed a second faculty member to grade the paper.  Its policy provided for an unbiased reviewer to blind grade the paper, which was supposed to be followed by a mediator's reconciling of the original grade and the second, blind grade.  Instead of a blind grader, the Center directed Pickett's program advisor—the same person who had previously refused Pickett's accommodation request and one of the faculty members whose feedback Pickett had ostensibly failed to incorporate—to grade the paper.  That faculty member assigned the paper 59 out of 79 possible points.  And instead of mediator-driven reconciliation, the Center just averaged the two marks for a final grade of 29.5 points.

Later, Pickett presented the same paper.  Her presentation received a grade of 89.  Pickett interpreted that grade to mean that her paper had met "program standards" all along.  But the damage was done:  She received a "C" in the course.  The DNP Program awards no credit for courses in which a student receives a "C."

Meanwhile, Pickett's difficulties continued in the Fall 2018 semester.  She renewed her LOA and showed it to her professors for that semester to request the same three accommodations: "extended time, an alternate testing location[,] and note-taking assistance."  But her professors did not provide her with lecture notes and presentations, which was required by her LOA as part of the note-taking assistance.

Pickett faced more challenges during the Fall 2018 semester.  She detailed those allegations in her complaint, but we do not recount them here because they lack direct relevance to the matters on appeal.  What's important is that she claims to have faced unfair obstacles that caused her academic performance to suffer.

That weak performance, coupled with Pickett's perception that the school was not accommodating her as her LOA required, increased Pickett's

stress. She was "unable to recover and experienced severe migraines" during exams. So her "anxiety and ADHD symptoms continued to escalate" throughout the semester, and she "experienced severe panic attacks." Her final grades that semester were "poor."

After the Fall 2018 semester concluded, defendant Evans—Dean of the School of Nursing—sent Pickett a letter announcing that she had been dismissed from the DNP Program. That letter explained the Center's dismissal policy, which contained four conditions under which students could be dismissed: (1) "earning a 'C' or lower in two or more DNP courses in one semester"; (2) "earning a 'C' or lower in the same DNP course twice"; (3) "earning a 'C' or lower in a second DNP course even though one DNP course has been retaken and a satisfactory grade . . . has been obtained"; and (4) maintaining a GPA below 2.0 "for two consecutive semesters." The letter explained that Pickett had "failed to meet one or more of the stated standards" and that the "DNP Council" had recommended that Pickett be dismissed from the program.

But Pickett "met none of the stated criteria." She received a "C" in *one* DNP Program course—the one that produced the dispute over her delayed paper's grade. She also received a grade lower than a "B" in another course—but that was in the *FNP* Program and not in the same semester in which she got the *DNP* Program "C." Because those programs are "separate and distinct," she did not meet any of the first three dismissal criteria. And she did not meet the fourth criterion because her GPA was not "below 2.0 at any time."

The Center's academic-dismissal policy permits students to petition the Dean for review. When a student appeals, the Center convenes "an appeal council." That procedure involves neither the "Department Chair nor the chair of the academic program." The policy provides that a student

remains enrolled and may attend courses while the appeal is considered. That procedure is the sole "mechanism" by which the Center considers appeals.

Pickett "timely appealed" her dismissal. But the school did not follow its policy. For one thing, it did not "timely" respond to Pickett's petition. Meanwhile, it "cut off" her access to her school email account and "cancelled" her outstanding advising appointments within the DNP Program.

Next, Defendant Cherry—a department chair—contacted Pickett and gave her an "ultimatum": She could remain in either the DNP or FNP Program, but not both. That message surprised Pickett because the letter purporting to dismiss her had mentioned only the DNP Program. And she thought that her appeal of that dismissal was still pending, not to mention that Cherry was not supposed to participate in the appeal process. Unsure how to proceed, Pickett resolved to request more time to decide.

But at the very moment Pickett was prepared to ask Cherry for more time, she "simultaneously received" another email from Cherry. Cherry announced that Pickett's dismissal "would stand."

## B.

Pickett sued the Center, Evans, and Cherry—the latter two defendants in both their official and individual capacities. She brought claims under the ADA, the Rehabilitation Act, and the Due Process Clause via Section 1983. Pickett's ADA claims implicated two theories of liability: failure-to-accommodate and conscious discrimination. Pickett's due-process claim involved both procedural and substantive theories of liability. Those claims were based on the contention that Pickett had a "protected property interest" in her continued education at the Center.

The defendants moved to dismiss Pickett's claims for lack of subject-matter jurisdiction and for failure to state a claim. As relevant to this appeal,

they contended that (1) assuming Pickett had a right protected by the Due Process Clause, she could not show that it had been infringed, and that (2) the defendants were immune from Pickett's ADA claims.

The defendants attached four exhibits to their motion. They hoped to rebut Pickett's allegations concerning the Center's policies. Pickett responded with four exhibits of her own.

The defendants' motion was first evaluated by a magistrate judge ("MJ"). The MJ first explained that he had not considered any of the parties' exhibits—only the face of Pickett's complaint. The MJ also discussed Pickett's ADA and substantive-due-process claims. Regarding her ADA claims, the MJ recommended that the district court dismiss Pickett's failure-to-accommodate claims except as they related to the Center's failure to provide Pickett with lecture notes and her advisor's refusal to amend the one-week-before-due-date deadline for pre-submission review. He also counseled concluding that Pickett had stated plausible disability-discrimination claims. And he advised the district court to hold that Congress had permissibly abrogated the defendants' sovereign immunity from those ADA claims.

The MJ did not recommend a disposition for Pickett's substantive-due-process claim. But while analyzing Pickett's ADA claim, he outlined his view of the caselaw regarding substantive due process rights in higher education. He explained that the law is "far from settled." (Quotation omitted.) He found no "controlling authority that definitively answers the question of whether Pickett possesses a protected substantive . . . due process right" that is implicated here. And he noted that courts have often declined to answer the question after concluding that, even if such a right existed, the plaintiffs had failed to meet the high bar for establishing a violation of that right.

The district court adopted the MJ's recommendations that are relevant to this appeal. It considered some of the exhibits attached to the defen-

dants' motion to dismiss but concluded that they hadn't rebutted Pickett's allegations. It partially denied the defendants' motion regarding Pickett's ADA claims, concluding that (1) Pickett had stated claims for failure to provide note-taking assistance and declining to extend the advisor-review deadline and that (2) Congress had validly abrogated sovereign immunity for those claims.

The court also concluded that Pickett had stated a substantive-due-process claim, although it did not reach the question whether Pickett had an interest protected by the Due Process Clause. The court reasoned that Pickett had plausibly pleaded a "substantial departure from accepted academic norms." (Quotation omitted.) It pointed to Pickett's allegations that she didn't meet any of the Center's criteria for dismissal and that the DNP and FNP Programs were supposed to be distinct. So the court concluded that it could not assume that Pickett's rights were not violated. It noted that the defendants had not challenged Pickett's assertion of a protected property interest.

The defendants filed this interlocutory appeal of the order denying in part their motion to dismiss. They claim that we have jurisdiction to decide (1) whether Pickett's surviving ADA claims should have been dismissed for lack of subject-matter jurisdiction and (2) whether she failed to state substantive-due-process claims.

## II.

We must begin by demarcating our appellate jurisdiction over this interlocutory order. *See Ortiz v. United States*, 138 S. Ct. 2165, 2172 (2018); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998). The general rule is that we may review "final decisions of the district courts." 28 U.S.C. § 1291; *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545–47 (1949). But we may also review certain interlocutory orders under 28 U.S.C. § 1292.

No. 21-11087

And we have recognized narrow classes of claims over which we have "pendent appellate jurisdiction," an exception to which we will shortly return. *Escobar v. Montee*, 895 F.3d 387, 391–93 (5th Cir. 2018).

## A.

A district court decision is "final" under Section 1291 when (1) the "court disassociates itself from a case" *or* when (2) it renders a decision that is "conclusive, [resolves] important questions separate from the merits, and [is] effectively unreviewable on appeal from the final judgment in the underlying action." *Burge v. Parish of St. Tammany*, 187 F.3d 452, 476 (5th Cir. 1999) (quotation omitted). That second path to finality is called the "collateral order doctrine." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 41 (1995) (quotation omitted). We may review such collateral orders immediately. *Id.*

One example of an appealable collateral order is a denial of official immunity. That order is collateral under Section 1291 because an official immunity is "an *immunity from suit* rather than a mere defense to liability"; "it is effectively lost if a case is erroneously permitted to go to trial." *Burge*, 187 F.3d at 476 (quoting *Swint*, 514 U.S. at 42).

The defendants claim that the district court erroneously denied them sovereign immunity from Pickett's ADA claims. An order denying that form of immunity is immediately reviewable under the collateral order doctrine. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993). So we have appellate jurisdiction over Pickett's ADA claims.

## B.

The case for appellate jurisdiction over Pickett's substantive-due-process claims is less straightforward. The defendants maintain that we have "pendent appellate jurisdiction" over those claims because they are "inextricably intertwined" with Pickett's ADA claims. The defendants attribute the

No. 21-11087

"inextricably intertwined" standard to *Swint*, 514 U.S. at 51. But *Swint* did not adopt the doctrine of pendent appellate jurisdiction; it expressly declined to "definitively . . . settle" the propriety of asserting jurisdiction under that label. *Id.* at 50. Before we can unpack the law of pendent appellate jurisdiction, however, we must explain why the defendants assert that the ADA and substantive-due-process claims are so closely related.

1.

Pickett asserted her ADA claims against the Center and Evans and Cherry in their official capacities. The Center is part of Texas Tech University, an agency of Texas that enjoys sovereign immunity. *Lowe v. Tex. Tech Univ.*, 540 S.W.2d 297, 298 (Tex. 1976); *see also Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429–30 (1997). And because Evans and Cherry were sued as officers of the Center, the claims against them are also treated as claims against Texas. *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017). It follows that all of Pickett's ADA claims are barred by sovereign immunity unless Texas has waived it or Congress has abrogated it. *Hans v. Louisiana*, 134 U.S. 1, 16–18 (1890); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996).

Pickett contends that Congress abrogated state sovereign immunity via the ADA. To decide whether Congress has abrogated a state's sovereign immunity, "we ask two questions." *Seminole Tribe*, 517 U.S. at 55. *First*, has Congress "unequivocally expressed its intent to abrogate the immunity?" *Id.* (quotation omitted and alteration adopted). *Second*, if it has, did it validly exercise an enumerated power capable of abrogating state sovereign immunity? *Id.* at 55, 59.

Congress provided for the ADA to abrogate state sovereign immunity. Among other provisions, the ADA says that states "shall not be immune . . . from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter. In any [such] action . . . , remedies . . . are available

12

for such a violation to the same extent as . . . in an action against [non-states]." 42 U.S.C. § 12202. The Supreme Court has acknowledged that provision as sufficiently unambiguous. *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363–64 (2001). And the defendants do not dispute that conclusion.

The defendants instead make their stand on the second prong of the abrogation analysis. Pickett's claims arise under Title II of the ADA, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Supreme Court has already considered whether Title II may abrogate state sovereign immunity.

Title II abrogates state sovereign immunity where it prohibits conduct that violates the Fourteenth Amendment. *United States v. Georgia*, 546 U.S. 151, 158–59 (2006). Insofar as it prohibits conduct that does not directly violate the Fourteenth Amendment, Title II can abrogate sovereign immunity only where Congress's abrogation power is "nevertheless valid." *Id.* at 159. Congress's abrogation power is "nevertheless valid" where Title II imposes requirements that are "congruent and proportional" to an identified "pattern of [unconstitutional] exclusion and discrimination"—even if it sweeps in some conduct that is not itself unconstitutional. *Tennessee v. Lane*, 541 U.S. 509, 531 (2004); *see also City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). In other words, Section 5 of the Fourteenth Amendment contains an enumerated power capable of abrogating state sovereign immunity, subject to the limitations that ordinarily accompany that provision. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976).

Under *United States v. Georgia*, 546 U.S. at 159, we ask three questions to decide whether the defendants are entitled to sovereign immunity: *First*, has Pickett stated a plausible Title II claim? *Second*, to the extent that she has,

do those allegations also state a violation of the Fourteenth Amendment? *Third*, to the extent that Pickett has stated a plausible Title II claim that is not *also* a Fourteenth Amendment violation, has she identified prohibited conduct that is congruent and proportional to a pattern of Fourteenth Amendment violations that Congress sought to remedy?[2]

Pickett's ADA and substantive-due-process claims collide, if at all, at the second and third questions. That's because Pickett has the burden at all times to establish federal jurisdiction, *Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375, 377 (1994), and a claim barred by sovereign immunity lies outside federal courts' subject-matter jurisdiction, *Rodriguez v. Texas Commission on the Arts*, 199 F.3d 279, 280–81 (5th Cir. 2000). Pickett has advanced only one reason why the ADA has permissibly abrogated Texas's sovereign immunity here: Texas infringed her "constitutionally protected property interest" in violation of the Due Process Clause.[3] So Pickett's ADA claim survives the state's assertion of sovereign immunity only if she has pleaded a Title II claim that is plausibly also either (1) a violation of her right to due process or (2) congruent and proportional to a pattern of violations of due process rights that Congress sought to remedy.

According to the defendants, that means that Pickett's Title II claim is "fundamentally premised on the district court's ruling that Pickett stated a

---

[2] We address those questions in that order. *See Block v. Tex. Bd. of Law Exam'rs*, 952 F.3d 613, 617–18, 618 n.12 (5th Cir. 2020) (holding that we do not proceed to the Fourteenth Amendment analysis until we have determined that the plaintiff "has stated a claim under Title II").

[3] On appeal, Pickett also asserts that she has liberty interests that are protected by the Due Process Clause. But Pickett did not plead that theory in her complaint. *See Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005). Nor did the district court rule on it. *Amin v. Mayorkas*, 24 F.4th 383, 391 n.4 (5th Cir. 2022). So we may not consider it.

No. 21-11087

claim for a violation of her substantive due process rights." So, they say, the two claims are "inextricably intertwined," giving us pendent appellate jurisdiction to consider the merits of a claim that is not otherwise final under 28 U.S.C. § 1291. We disagree.

2.

Though the defendants cite only *Swint*'s "inextricably intertwined" language, the matter of pendent appellate jurisdiction is considerably more nuanced. We must take great care to avoid "indiscriminate appellate review of interlocutory orders." *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1714 (2017). Exercising "pendent appellate jurisdiction in [the] collateral-order context" risks "undermin[ing] [28 U.S.C.] § 1292(b)." *Id.* (citing *Swint*, 514 U.S. at 46). Pendent appellate jurisdiction is not specifically provided for by Sections 1291 and 1292, and the Supreme Court has exercised pendent appellate jurisdiction only once.[4] So under our precedent, "pendent appellate jurisdiction is carefully circumscribed." *Escobar*, 895 F.3d at 391.

We have recognized four "rare and unique" circumstances under which pendent appellate jurisdiction "may be proper." *Id.* at 392 (quotation omitted). Those circumstances are presented where "(1) the court will decide some issue in the properly brought interlocutory appeal that necessarily disposes of the pendent claim; (2) addressing the pendent claim will further the purpose of officer-immunities . . . ; (3) the pendent claim would be otherwise unreviewable; or (4) the claims involve precisely the same facts and elements." *Id.* at 392–93 (footnotes omitted). None of those circumstances

---

[4] *Clinton v. Jones*, 520 U.S. 681, 707 n.41 (1997) (explaining that pendent appellate jurisdiction was appropriate because review of one order was "necessary to ensure meaningful review" of another order over which the Court separately had appellate jurisdiction) (quoting *Swint*, 514 U.S. at 51).

15

applies here.

Deciding Pickett's ADA claims will not necessarily dispose of her substantive-due-process claims. That's because it is possible to rule on the former without passing on the latter. *See Byrum v. Landreth*, 566 F.3d 442, 450 (5th Cir. 2009). The first question under *United States v. Georgia*—the extent to which Pickett has stated a Title II claim—acts as a filter that can create separation between the ADA and substantive-due-process claims. For one thing, Pickett may not have stated a Title II claim at all, which would mean that we never would reach the Fourteenth Amendment question. Even if she has stated Title II claims, we are limited to the allegations that plausibly implied those claims when considering whether the Fourteenth Amendment allowed Congress to abrogate state sovereign immunity. But were we to consider whether Pickett has pleaded a plausible Fourteenth Amendment violation, we could consider all her factual allegations. So there are at least two ways that we could rule on the ADA claims that would not fully dispose of the Fourteenth Amendment claims. In other words, those claims are not "inextricably intertwined." *Swint*, 514 U.S. at 51.

Moreover, Pickett appears to contend that Title II may permissibly abrogate state sovereign immunity because her ADA-violating allegations state substantive- *and procedural*-due-process claims.[5] For instance, in the same paragraph of her brief, she remarks that "[b]oth substantive and procedural due process[ ] ensure that individuals are not denied [life, liberty, or property] *arbitrarily*" and that the defendants "are not protected by sovereign immunity because ADA violations occurred [that infringed her] 14[th] Amendment

---

[5] The district court dismissed Pickett's claims grounded in procedural due process. Pickett has not tried to appeal that order, but whether violations of procedural due process may nevertheless sustain an ADA claim past an assertion of sovereign immunity is a separate question.

rights." If that position is correct, it would provide a third way for us to resolve her ADA claims without disposing of her substantive-due-process claims. We could hold that her allegations that state a Title II claim also state a violation of her *procedural*-due-process rights and so never reach the substantive-due-process question.

Nor would exercising pendent appellate jurisdiction further the purpose of officer immunities. The defendants are immune, if at all, only from the ADA claims. Officer immunities are claim-specific. *See Gros v. City of Grand Prairie*, 209 F.3d 431, 437 (5th Cir. 2000). We have exercised pendent jurisdiction over related claims where the defendant asserted immunity from the *pendent* claim but the order denying that immunity was nevertheless ineligible for interlocutory review because the claim was based in state law. *E.g.*, *Morin v. Caire*, 77 F.3d 116, 119–20 (5th Cir. 1996). That rationale does not apply here because the defendants have not asserted immunity from the substantive-due-process claims; they have denied that Pickett stated claims.

Nor will the district court's order refusing to dismiss Pickett's substantive-due-process claims be unreviewable. Those claims will inexorably terminate in a final judgment. The losing party may then appeal, at which point this court would have to determine whether the defendants violated Pickett's substantive-due-process rights. Nothing but time would be lost by waiting. And we may not "expand our appellate jurisdiction" for efficiency's sake. *McKee v. City of Rockwall*, 877 F.2d 409, 413 (5th Cir. 1989).

Finally, the categories of claims involve different facts and elements. As we have explained, the facts relevant to the claims could be different because the only facts relevant to the Fourteenth Amendment portion of the ADA-sovereign-immunity question are those that plausibly imply a Title II violation. But all of Pickett's allegations are relevant to deciding whether she has Fourteenth Amendment claims. And deciding the substantive-due-

process claim could implicate elements different from the question whether the defendants are immune from the ADA claims because there are multiple ways to resolve the sovereign immunity question without commenting on substantive due process.

So this is not a "rare and unique" case in which we may exercise pendent appellate jurisdiction. *Escobar*, 895 F.3d at 393 (quotation omitted). We dismiss the defendants' appeal of the order refusing to dismiss Pickett's substantive-due-process claims. We consider only whether the defendants are immune from Pickett's ADA claims.

## III.

"We review the district court's jurisdictional determination of sovereign immunity *de novo*." *Lewis v. Scott*, 28 F.4th 659, 663 (5th Cir. 2022) (quotation omitted).

## A.

The first question is whether the district court erred by failing to credit the defendants' rebuttal evidence. The defendants complain that "Pickett offered no contrary proof to establish her bare allegations in the Complaint." If this appeal had arisen from a motion to dismiss under Rule 12(b)(6), we would be bound to accept Pickett's well-pleaded allegations as true and—because she appears *pro se*—to hold her complaint to a "less stringent standard[ ]" than if it were drafted by a lawyer. *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) (quotation omitted). But this appeal arises from a motion to dismiss under Rule 12(b)(1) because state sovereign immunity operates as a jurisdictional bar. *Skelton v. Camp*, 234 F.3d 292, 295–96 (5th Cir. 2000). According to the defendants, that posture permitted the district court to weigh the evidence.

The defendants cite two cases for that theory. The first is *Menchaca v.*

No. 21-11087

*Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). *Menchaca* recognized the general principle that a "factual attack" on subject-matter jurisdiction may permit the district court to consider "matters outside the pleadings, such as testimony and affidavits." *Id.* (quotation omitted). The second case is *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006), where the Supreme Court explained that "in some instances, if subject-matter jurisdiction turns on contested facts, the trial judge may be authorized to review the evidence and resolve the [fact] dispute." For that proposition, the Court cited sections of the two leading federal-court treatises.[6]

Once again, the operative rule is much more complex than those contentions reveal.[7] The general thrust of the defendants' contention, though, is correct: A district court may "dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. May 1981). But there are limits to a district court's ability to resolve fact disputes on a Rule 12(b)(1) motion.

One of those limits is relevant here. One of the treatise sections cited by the Supreme Court explains,

The district court . . . must weigh the merits of what is pre-

---

[6] *Id.*; 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1350 (3d ed. 2004); 2 James W. Moore et al., Moore's Federal Practice § 12.30[3] (3d ed. 2005).

[7] For the second time in this litigation, the defendants have provided only the most general statement of a rule that they say supports their position and omitted our more specific guidance. Their briefing on those points borders on inadequacy. Particularly where they face *pro se* litigants, the defendants must take greater care in the future so that their lack of diligence is not mistaken for lack of candor.

> sented on a Rule 12(b)(1) motion to dismiss, including resolving any issues of fact, and decide the question of subject matter jurisdiction . . . . If, however, a decision of the jurisdictional issue requires a ruling on the underlying substantive merits of the case, the decision should await a determination of the merits either by the district court on a summary judgment motion or by the fact finder at trial. For example, . . . when subject matter jurisdiction is dependent on the same statute that forms the basis of the underlying claim, the jurisdictional question is tied up with the merits of the case.[8]

That section cites, among other cases, *Montez v. Department of the Navy*, 392 F.3d 147, 150 (5th Cir. 2004), which held that "where issues of fact are central both to subject matter jurisdiction and the claim on the merits, . . . the trial court must assume jurisdiction and proceed to the merits."

So the question whether the trial court could have resolved factual disputes here depends on whether the subject-matter jurisdiction and merits questions are coterminous. We conclude that they are.

We have addressed this issue at least three times in Federal Tort Claims Act cases. In *Williamson*, we recognized that where "the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits." 645 F.2d at 415. We reaffirmed that principle in *Montez*, 392 F.3d at 150, and described our "general rule": "[R]esolution of the jurisdictional issue on a 12(b)(1) motion [is] improper" where the jurisdictional attack is "intertwined with the merits of [a] claim."[9] We did the same in *M.D.C.G. v. United States*, 956 F.3d 762,

---

[8] WRIGHT & MILLER, *supra* note 6, at § 1350, Westlaw (database updated Apr. 2022) (footnotes omitted).

[9] The most notable exception to that "general rule"—which is itself an exception to the rule that district courts may resolve fact disputes on Rule 12(b)(1) motions—applies

No. 21-11087

768–69 (5th Cir. 2020).[10]

We also recently applied *Montez* outside the FTCA context. *S. Recycling, L.L.C. v. Aguilar (In re S. Recycling, L.L.C.)*, 982 F.3d 374, 379–82 (5th Cir. 2020). There, we explained that whether district courts may resolve contested fact issues depends on "the *extent* to which the jurisdictional question is intertwined with the merits." *Id.* at 380. We asked three questions to decide whether the issues were inextricably intertwined: *First*, does the "statutory source of jurisdiction differ[ ] from the source of the federal claim?" *Id.* *Second*, can "the jurisdictional issue . . . be extricated from the merits and tried as a separate issue?" *Id.* (quoting *Williamson*, 645 F.2d at 416 n.10).

---

to Foreign Sovereign Immunities Act ("FSIA") cases. *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172–73 (5th Cir. 1994). In FSIA cases, district courts may resolve factual disputes even where they are "inextricably intertwined with the merits." *Id.* at 172. In *Montez*, we declined to extend that principle to FTCA cases. We explained that foreign sovereign immunity is different from federal sovereign immunity because the need for "international comity" heightens the need for "special procedures designed to preserve a foreign sovereign's immunity from suit." *Montez*, 392 F.3d at 150. Accordingly, procedures for adjudicating FSIA claims—for example, "circumscribed discovery procedures"—are often "depart[ures]" from general practice. *Id.* (citing *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 534 (5th Cir. 1992)).

[10] *M.D.C.G.* put to rest any doubts about *Montez*'s vitality that arose after *Houston Refining, L.P. v. United Steel*, 765 F.3d 396, 407 n.20 (5th Cir. 2014). There, one member of our court questioned whether *Montez* was correct or consistent with *Steel Co.*, 523 U.S. at 94–95, which forbids "hypothetical jurisdiction." *Hous. Refin.*, 765 F.3d at 407 n.20. Though *Montez* spoke of district courts "assum[ing] jurisdiction and proceed[ing] to the merits," 392 F.3d at 150, that is not the sort of hypothetical jurisdiction forbidden by *Steel Co. Steel Co.*, 523 U.S. at 93–94, forbids beginning with the merits question where it could be "more readily resolved" than the jurisdictional question, *id.* at 93.

Under *Montez*, by contrast, courts should assume that the factual allegations in the complaint are true for purposes of the Rule 12(b)(1) motion. Then they should determine whether those allegations establish that the court has subject-matter jurisdiction. If the well-pleaded facts, taken as true, establish subject-matter jurisdiction, the court may then resolve the contested issue of fact on a motion for summary judgment or at trial. There is nothing "hypothetical" about jurisdiction established under that procedure.

*Third*, does "judicial economy favor[ ] early resolution of the jurisdictional issue?" *Id.*

The answers to those questions demonstrate that the jurisdictional and merits questions are coterminous. On the first question, "the court's subject matter jurisdiction is derived from the same statute as the cause of action." *Id.* Pickett's cause of action comes from the ADA. And the district court has jurisdiction only if the ADA abrogated state sovereign immunity. That fact goes a long way towards establishing that the issues are intertwined. *Id.*[11] That's because separate statutory questions imply that one—the jurisdictional statute—can be considered "antecedent" to the other, *id.* at 381, as *Steel Co.*, 523 U.S. at 101, requires. But that's not possible here.

The second question turns on whether the legal issues are "*identical*." *S. Recycling*, 982 F.3d at 381. They are, because the merits question—whether Pickett stated ADA claims—is first element of the jurisdictional question. And because it is the *first* element—unlike in our previous discussion about the relationship between Pickett's ADA and due-process claims—the court always must reach it. So this case presents the same scenario as the FTCA cases. It is not possible to "extricate[ ]" the jurisdictional question from the merits claim. *Id.*

The third question is "closely related" to the second. *Id.* at 382. Judicial economy is served by resolving contested fact issues at the pleading stage where, for instance, the jurisdictional question is much simpler than the merits question. *Id.* That's not true here: the jurisdictional question *is* the merits question with extra steps on the back end.

All of the factors from *Southern Recycling* support the conclusion that

---

[11] *See also Gonzalez v. United States*, 284 F.3d 281, 287 (1st Cir. 2002); *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1324 (10th Cir. 2002).

the jurisdictional and merits questions here are inextricable. This case is like *Williamson*, *Montez*, and *M.D.C.G.*, among others. The district court did not err by declining to resolve the disputed factual issues.[12] So we consider whether Pickett stated a claim by accepting her well-pleaded allegations as true and considering them in the light most favorable to her.

## B.

Armed with the proper standard of review, we advance to the first question under *United States v. Georgia*, 546 U.S. at 159: To what extent has Pickett pleaded a plausible claim under Title II of the ADA?

As the MJ and district court recognized, Pickett's claims implicate two Title II theories. The first is that the defendants failed reasonably to accommodate her disability. *See, e.g.*, *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 455 (5th Cir. 2005). The second is that they knowingly discriminated

---

[12] A different issue would arguably have been presented if the district court were empowered to resolve disputed issues of fact on a Rule 12(b)(1) motion but chose not to. Some of our cases have stated that where "the district court rules on jurisdiction without resolving factual disputes[,] we consider the allegations in the plaintiff's complaint as true." *Di Angelo Publ'ns, Inc. v. Kelley*, 9 F.4th 256, 260 (5th Cir. 2021) (quoting *Laufer v. Mann Hosp., LLC*, 996 F.3d 269, 272 (5th Cir. 2021)) (alteration adopted). That could be taken to mean that any time the district court chooses not to pass on a fact issue—even if it could have—we are limited to the face of the complaint. Of course, that principle would have resolved this case much more simply.

But we think that reading would misconstrue *Di Angelo* and the cases on which it relied. Tracing *Di Angelo*'s citations leads back to *Williamson*, 645 F.2d at 413, where we stated the general rule that a district court may resolve Rule 12(b)(1) motions on the pleadings, the pleadings plus undisputed facts, or the foregoing plus its resolution of contested fact issues, as the situation requires. And in *Di Angelo*, 9 F.4th at 260, *Laufer*, 996 F.3d at 272, and *St. Tammany Parish ex rel. Davis v. FEMA*, 556 F.3d 307, 315 (5th Cir. 2009), it appears that there were no contested issues of fact to resolve.

Still, we need not answer the question whether the district court must exercise its fact-finding power when a Rule 12(b)(1) motion presents that opportunity. So we reserve it for another day.

against her because of her disability.  *See, e.g.*, *Soledad v. U.S. Dep't of the Treasury*, 304 F.3d 500, 503–04 (5th Cir. 2002).  We proceed in that order.

1.

Only two aspects of Pickett's failure-to-accommodate claims are before us.  That's because the district court denied sovereign immunity to the defendants regarding only two of Pickett's possible claims, and Pickett has not tried to cross-appeal.  The district court and the MJ concluded that Pickett had stated failure-to-accommodate claims concerning (1) her professors' failure to give her lecture notes and materials as required by her LOA and (2) her advisor's refusal to modify the one-week-before-due deadline for pre-submission feedback.

"To succeed on a failure-to-accommodate claim, a plaintiff must prove:  (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations."  *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020) (quotation omitted).  If the plaintiff proves those three elements, "the defendants are liable simply [for] denying [the accommodation]."  *Bennett-Nelson*, 431 F.3d at 455.

Defendants advance several reasons why Pickett has not satisfied those elements for either of her failure-to-accommodate claims.  Some of their complaints relate to evidentiary sufficiency.  As we have just explained, we do not consider those points.  They also claim, however, that Pickett failed to connect the officer defendants—Cherry and Evans—to her relevant allegations.  And they say that Pickett was obligated to present her request for deadline accommodations to the Center's ADA office rather than making it verbally to her advisor.  We agree on both counts.

To plead a claim against an officer defendant, the plaintiff must allege facts that plausibly imply that the officer was involved in the challenged

decision. *See Haverkamp v. Linthicum*, 6 F.4th 662, 670–71 (5th Cir. 2021) (per curiam). We agree with the defendants that Pickett failed to "even suggest that Drs. Cherry and Evans had a role in providing accommodations to Pickett." From the face of Pickett's complaint, those defendants do not appear to have been involved in failing to provide Pickett with lecture notes and materials. That failure falls on the professors in those courses and, by extension, the Center. Nor do Cherry and Evans appear to have been involved in the advisor's deadline inflexibility; Pickett's complaint says nothing of asking them to overrule the advisor's decision. So the failure-to-accommodate claims against Cherry and Evans should have been dismissed.

Pickett's claims against the Center arising from the advisor's decision also fail for a related reason. Pickett did not tell the Center's ADA Office that she needed those deadlines extended. As the defendants observe, a rule imposing liability for failing to accommodate verbal, *ad hoc* requests made to a single faculty member would "impose an unreasonable burden to accommodate a student's whims." Pickett's complaint alleges that the Center has a centralized, interactive process for requesting accommodations—one that she has successfully used before.

In the employment context, we have noted that requesting and providing reasonable ADA accommodations must be an "interactive process" that includes "the input of the employee as well as the employer." *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735 (5th Cir. 1999). That's for good reason. The objective of the reasonable-accommodation requirement is to find a solution that works for both parties.[13] The same is true in education.

---

[13] *See* 28 C.F.R. § 35.130(7)–(8) ("A public entity shall make reasonable modifications . . . when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. . . . A public entity shall not

The Center cannot maintain an interactive accommodations process without centralizing accommodations requests. Schools are obliged to carefully weigh whether requested accommodations are "feasible" and "effective." *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999). That inquiry requires expertise that individual professors may not have. And defendants correctly point out that putting that burden on individual professors would create an "alternative, undocumented" process, introducing disarray. Such a rule would undermine schools' ability to preserve interactivity in their handling of ADA requests.

So Pickett failed to state a claim for failure to accommodate her by refusing to move back the deadlines. In the language of *Smith*, 956 F.3d at 317, she did not ensure, in "direct and specific terms," that her limited ability to meet deadlines was "known by the covered entity." (Quotation omitted.) Her existing accommodations, which related only to testing and note-taking assistance, did not make her need "open, obvious, and apparent *to the entity's relevant agents*." *Id.* at 318 (quotation omitted and emphasis added). Her claims should have been dismissed insofar as they arise from that theory.

Still, Pickett successfully pleaded a claim against the Center for failing to provide her with the lecture notes and materials. The Center agreed that giving her those materials was reasonable by putting that accommodation in her LOAs each semester. Pickett explains that she nevertheless did not receive them on "numerous instances." If that is true, the Center is liable for failing to provide the accommodation. *Bennett-Nelson*, 431 F.3d at 455.

---

impose or apply eligibility criteria that screen . . . individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.").

2.

The MJ and district court also concluded that Pickett's disability-discrimination claims are "sufficient to survive dismissal." We agree.

To prove conscious discrimination under Title II, a plaintiff must show that his disability "play[ed] a role" in the defendant's "decision making process and [had] a determinative influence on the outcome." *Soledad*, 304 F.3d at 503–04 (quoting *Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 835 (5th Cir. 2000)).[14] Disability-related animus "need not be the sole reason" for the challenged decision. *Id.* at 503 (quoting *Ahrens*, 205 F.3d at 835).

The plaintiff must plead facts making it "plausible that he was discriminated against 'because of'"—but not necessarily *solely* because of—his disability. *Olivarez v. T-Mobile USA, Inc.*, 997 F.3d 595, 601 (5th Cir. 2021) (quoting *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019)). The plaintiff must include facts that allow the court to reasonably infer that his disability affected the decision. *Id.* After assuming those allegations to be true, we must undertake a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

Besides their irrelevant rebuttal evidence, defendants advance two reasons why Pickett has not stated a claim. The first is that Pickett's charge of conscious discrimination is implausible in light of the other reasons the Center had for dismissing her. The second is that Pickett has failed to "identify similarly-situated comparators." We disagree.

---

[14] That standard is lower than the standard for claims under Section 504 of the Rehabilitation Act, which requires that the challenged decision occurred "solely by reason of [the plaintiff's] disability." 29 U.S.C. § 794(a). In other respects, we generally interpret Title II and the Rehabilitation Act "*in pari materia*." *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (en banc).

No. 21-11087

The defendants say that Pickett's allegations cannot "overcome [their] legitimate, nondiscriminatory reasons justifying academic dismissal." That formulation smacks of summary judgment. It mirrors, for example, the evidentiary standard used to evaluate whether a complainant has made a *prima facie* case for discrimination under Title VII. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). But that framework is "an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). So too here.

The question is whether Pickett's allegations, taken as true, make it plausible that her disability played a role in the Center's decision to dismiss her. An explanation need not be the most likely to be plausible. *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus.*, 648 F.3d 452, 458 (6th Cir. 2011). Plausibility just requires that there is no "obvious alternative explanation" for the decision. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (quotation omitted).

Assuming that what Pickett says is true, it is not obvious that the Center dismissed her for nondiscriminatory reasons. She claims that her professors treated her poorly and graded her more harshly after learning of her disability. Among other things, she says the Center falsely accused her of lying about working clinical hours after she requested accommodations. She asserts that her professor gave her a "0" grade based on a requirement that "did not apply to other students." She avers that the Center failed to follow its own policies in at least three respects: first, when it regraded one of her papers; second, when it repeatedly failed to give her lecture notes that she was entitled to; and third, when it dismissed her from the program even though she did not meet any of the listed criteria for academic dismissal. It is plausible that animus played a role in those events.

Pickett was not required to "identify similarly-situated comparators." The defendants cite our decision in *Frame*, 657 F.3d at 231. There, we

28

explained that Title II is violated when a benefit inures to "persons without physical disabilities, yet that benefit is unnecessarily denied to similarly situated persons with physical disabilities." *Id.* That principle does not mean that each Title II plaintiff *must* identify a similarly situated comparator.

Our plausibility inquiry is not so cramped. For instance, we have recognized that "a departure from procedure can show discriminatory motive." *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 460 (5th Cir. 2019). More is required to *prove* discrimination, *see id.* at 459–60, but factual allegations that depict an institution's departure from its own policies make animus plausible where the context "suggests the decision-makers were willing to deviate from established procedures in order to accomplish a discriminatory goal." *Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 640 (5th Cir. 2021).

Pickett pleaded enough context to suggest that motive here. Her allegations depict repeated, not incidental, policy deviations. She claims to have achieved strong academic marks before her professors learned that she had requested accommodations. And though she concedes that her academic performance was not always exemplary in the DNP Program, the Center dismissed her from the "separate and distinct" FNP Program too.

We are also mindful that a mixed motive would have been unlawful. In other words, because violating Title II does not require that animus was the *sole* reason for a decision, we can consider the possibility that the Center dismissed Pickett for at least two reasons. For instance, it may have dismissed her in part because her academic performance had slipped—though not yet below standards—and in part because of animus. That possibility bolsters the plausibility of Pickett's discrimination theory.

So Pickett has "nudged [her] claims of invidious discrimination across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (quotations

omitted).  The defendants' desire to engage in "a rigorous factual analysis" must be "reserved for a later stage of the proceedings."  *Scott v. U.S. Bank Nat'l Ass'n*, 16 F.4th 1204, 1211 (5th Cir. 2021) (per curiam).  The district court correctly concluded that Pickett stated a Title II claim.

## C.

Because Pickett has pleaded some Title II claims, we must consider the second question under *United States v. Georgia*, 546 U.S. at 159:  To what extent do Pickett's plausible Title II claims also imply a violation of the Fourteenth Amendment?

Pickett advances only one reason why her claims present violations of the Fourteenth Amendment, although that reason has two aspects.  Pickett says the Center irrationally deprived her of a "constitutionally protected property interest" and so violated the Due Process Clause—both substantively and procedurally.

The Supreme Court has never decided whether one's interest in continuing his education could be a protected property interest.  In *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 222–25 (1985),[15] the Court assumed without deciding that the plaintiff had a protected property interest in his continued enrollment.  It explained that, if he had such a right, it could not be infringed except by "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."  *Id.* at 225.  In other words, "genuinely academic decision[s]" are beyond our power to question.  *Id.*  We

---

[15] The Supreme Court did the same thing in *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 91–92 (1978).

have duplicated that assumption and disposed of cases on like grounds.[16]

But this case presents the question in a new way. We have already concluded that Pickett has plausibly pleaded violations of Title II, and we address the Fourteenth Amendment only to determine whether the plausible violations constitute due-process violations. So the question is whether consciously discriminating against Pickett because of her disability and denying her the lecture notes and materials that she was promised were "substantial departure[s] from accepted academic norms." *Ewing*, 474 U.S. at 225.

The answer is easy. It could not be a "genuinely academic decision," *id.*, to dismiss someone capable of completing the coursework from school in part because he is disabled, *cf. City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446–47 (1985). Nor could it be an exercise of "professional judgment," *Ewing*, 474 U.S. at 225, to deny a student an accommodation that the institution had already deemed reasonable and necessary.

So we cannot assume that Pickett had no protected property interest. We must confront the question whether the Due Process Clause protected her desire to continue her education at the Center.

Or, at least, we *would* have to confront that question if it were properly before the court. But it is not before us because the defendants have not preserved it for this appeal.

The district court never decided whether Pickett had pleaded facts implying that she had an interest protected by the Due Process Clause. That's

---

[16] *Doe v. Harrell*, 841 F. App'x 663, 670 (5th Cir. 2021) (per curiam); *Patel v. Tex. Tech Univ.*, 941 F.3d 743, 747–48 (5th Cir. 2019); *Perez v. Tex. A&M Univ. at Corpus Christi*, 589 F. App'x 244, 250–51 (5th Cir. 2014) (per curiam); *Wheeler v. Miller*, 168 F.3d 241, 249–50 (5th Cir. 1999) (per curiam); *Levi v. Univ. of Tex. at San Antonio*, 840 F.2d 277, 281 (5th Cir. 1988).

because it thought the defendants had not contended "that [Pickett] . . . does not have a substantive-due-process right to higher education." It noted that its disposition would "not prevent defendants from raising [that objection] at a later time should they desire to do so."

The defendants disagree. They claim to have "asserted that Pickett lacks a substantive due process right in their objections to the [MJ's Findings, Conclusions, and Recommendations.]" They point to the following statement: "Assuming *arguendo* Pickett identified a substantive due process right at all—which she did not—stripped of conclusions, the factual allegations fall short of th[e] extremely high standard [for stating such a claim]." In other words, they put inordinate weight on the phrase, "which she did not."

But that is not all that defendants said about the matter. They also understood the MJ to have agreed that "Pickett does not establish that she has a fundamental right in her continued graduate education." Accordingly, they began that part of their analysis by assuming "the absence of a fundamental right being implicated."

Unfortunately for them, that is not what the MJ concluded. The MJ reasoned that he "need not resolve" the question "whether Pickett possesses a protected substantive or procedural due process right." That's because he concluded that, even if Pickett had no such right, the ADA nevertheless abrogated state sovereign immunity under the *third* prong of *United States v. Georgia*. So the defendants' briefing was unresponsive to the course of the litigation even insofar as they addressed whether a right exists.

In any event, nothing the defendants said to the district court about whether Pickett has a protected interest preserved that issue for appeal. "[T]o preserve an argument for appeal, the litigant must press and not merely intimate [it] before the district court." *FDIC v. Mijalis*, 15 F.3d 1314, 1327 (5th Cir. 1994). To press a theory means, "[a]t the very least," to "identify[ ]

[it] as a proposed basis for deciding the case." *United States v. Scroggins*, 599 F.3d 433, 447 (5th Cir. 2010). The theory must be described and supported well enough to give "the district court . . . an opportunity to rule on it." *Mijalis*, 15 F.3d at 1327.

So it is not enough that one can reasonably infer that the defendants thought that Pickett did not have a protected interest. The defendants were required to tell the district court, "Dismiss Pickett's claims because she does not have a protected interest." We agree with the district court that the defendants never said anything like that.

As we often say, "we are a court of review, not of first view." *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005). We have established that it is inappropriate to assume that Pickett had no interest protected by the Due Process Clause because she plausibly pleaded Title II violations representing a "substantial departure from accepted academic norms." *Ewing*, 474 U.S. at 225. That conclusion disposes of the issues properly presented by the parties. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). We therefore must conclude that the district court did not err by denying the defendants sovereign immunity from Pickett's claims insofar as she pleaded Title II violations. The district court may consider in the first instance whether Pickett's claims implicate the Fourteenth Amendment at all, provided that the defendants still wish to raise that contention.

\*    \*    \*

In summary, we have appellate jurisdiction over only the denial of sovereign immunity from Pickett's ADA claims. In this posture, we must assume that Pickett's allegations are true and draw all reasonable inferences in her favor. The state may or may not be correct that its rebuttal evidence vitiates any inference that the defendants discriminated against Pickett because of her disability. But the pleading stage was not the right time to raise those

No. 21-11087

contentions. Pickett has plausibly alleged defective accommodations and invidious discrimination forbidden by Title II of the ADA.

Those allegations fall within Congress's power to abrogate state sovereign immunity if they plausibly imply that she was irrationally deprived of cognizable property or liberty interests. Although we have done so in the past, Pickett's allegations do not permit us to assume that the Due Process Clause was not violated. Because the defendants have not preserved for appeal their contention that Pickett has no protected property right in her continued education, we may decide nothing further.

Accordingly, the appeal is DISMISSED in part, and the order appealed from is AFFIRMED in part and REVERSED[17] in part. This opinion is not to be understood as an indication of how the district court is to rule on any remaining issues. We place no limitation on the matters the court should address in light of this interlocutory ruling.

---

[17] The district court's order is reversed insofar as it declined to dismiss for want of subject-matter jurisdiction the failure-to-accommodate claims that are (1) brought against Cherry and Evans in their official capacities or (2) are premised on Pickett's advisor's failure to extend the deadline for pre-submission review.