# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 27, 2022

Lyle W. Cayce
Clerk

No. 20-50103

─────────────

Robert Watts,

*Plaintiff—Appellant*,

*versus*

Northside Independent School District; Mack Edward Breed,

*Defendants—Appellees*.

─────────────

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:17-CV-887

─────────────

Before Wiener, Costa, and Willett, *Circuit Judges*.

Gregg Costa, *Circuit Judge*:

Texas high school football has a storied history. *See generally* H. G. Bissinger, Friday Night Lights: A Town, a Team, and a Dream (1990). But what happened on the Friday night in September 2015 when Marble Falls High School played John Jay High School may have been unprecedented. By the fourth quarter, John Jay's assistant coach Mack Breed was "increasingly agitated, angry and enraged over his belief that the referee crew was making 'bad calls,'" and over "alleged racial comments" referee Robert Watts had directed at players. Coach Breed told John Jay

players "to hit" Watts because "he need[ed] to pay the price."  In the game's closing minutes, two John Jay players followed that order.  They ambushed Watts from behind.  The assault left Watts with "a turf burn on his forehead, a cut next to his right eye, and a large abrasion on his left arm."  He "received a concussion" and experienced "post-concussion syndrome and anxiety disorder."[1]

The incident went viral.  The two John Jay players who attacked Watts appeared on *Good Morning America*, where they "expressed remorse for their actions and maintained they were just doing as they were told" by Breed.  The players, who followed Breed's direction to "hit the ref," said they "knew what they did was wrong, but they did it anyway because of their trust in Breed."  John Jay's principal told ESPN that Breed "admitted to him and Head Coach Gary Gutierrez that he 'directed the students to make the referee pay for his racial comments and calls.'"

In December 2015, Breed pleaded guilty to assault causing bodily injury, affirming that he did "intentionally, knowingly, or recklessly cause bodily injury to Robert Watts by striking him."  Breed's conviction required him to permanently relinquish his teaching license.

This civil rights suit, filed in state court and later removed to federal court, followed.  The magistrate judge recommended dismissing the section 1983 claim against the school district under Rule 12(b)(6) because: (1) there was no state action as the players who hit Watts were private actors, and (2) even if there were a constitutional violation, the school district was not the moving force behind it and thus could not be liable, *see Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 694 (1978).  The magistrate judge later

---

[1] The quoted material comes from the complaint as we must take its allegations as true at the pleading stage when this case was dismissed.

recommended dismissing the substantive due process claim against Breed because the law is not clearly established that he was a state actor in this incident. He further recommended that the state law claims against Breed be dismissed without prejudice, allowing them to be pursued in state court. *See* 28 U.S.C. § 1367(c)(3) (providing that a federal court may decline to exercise supplemental jurisdiction over claims when it "has dismissed all claims over which it has original jurisdiction"). The district court agreed on all counts, dismissing the federal claims with prejudice and the state claims without prejudice.

We affirm the dismissal of the school district. No policy or custom of Northside Independent School District directed the assault on Watts—quite the opposite, Breed had gone rogue in ordering the assault—so the district is not liable under section 1983. *See Monell*, 436 U.S. at 694.

We reach a different conclusion when it comes to the pleading-stage dismissal of the claims brought against Breed in his own capacity. The district court focused on the "state created danger" theory that Watts invokes. It correctly ruled that this theory could not be a basis for liability. We have "repeatedly declined to recognize the state-created danger doctrine." *Joiner v. United States*, 955 F.3d 399, 407 (5th Cir. 2020). A claim that we have expressly not recognized is the antithesis of a clearly established one. *See Keller v. Fleming*, 952 F.3d 216, 227 (5th Cir. 2020) (dismissing a case on qualified immunity grounds because the Fourteenth Amendment claim required recognition of the state-created-danger theory).

But the state-created-danger theory does not even fit this situation in which a public employee ordered private actors to commit an assault. Instead, the theory applies when a state actor creates a dangerous condition that results in harm. It involves a *mens rea* of deliberate indifference, not the intentional infliction of harm. *See Doe ex rel. Magee v. Covington Cnty. Sch.*

*Dist. ex rel. Keys*, 675 F.3d 849, 865 (5th Cir. 2012) (en banc) (listing the elements that such a claim would require though abstaining from recognizing it). A good example of the type of situation in which plaintiffs invoke the state-created-danger theory is the Texas A&M bonfire disaster that killed twelve students in 1999. *See Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 537–38 (5th Cir. 2003). The plaintiffs argued that university officials were deliberately indifferent to the "dangers posed by the construction of the bonfire stack." *Id.* at 538. But no one contended that those officials wanted the bonfire to collapse or ordered anyone to make that tragedy happen. Or, to use an example from high school football, plaintiffs have invoked the state-created-danger theory to try and hold schools and coaches liable for injuries that occur on the field in the normal course of practice and games. *See, e.g.*, *Yarbrough v. Sante Fe Ind. Sch. Dist.*, 2022 WL 885093, at *1–2 (5th Cir. March 25, 2022) (rejecting such a claim). Again, the argument is that state actors are responsible for allowing dangerous conditions to persist. *Id.* at *2. Cases like *Yarbrough* do not involve coaches ordering players to hurt others on the field.

This case does. Breed's ordering players to assault the referee thus does not fit in the state-created-danger box. Instead, it is an example of a public official's ordering private actors to engage in conduct. The law has long recognized that state action exists when a state actor commands others to commit acts as much as when the state actor commits those acts. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2014) ("We have, for example, held that a challenged activity may be state action when it results from the State's exercise of 'coercive power,' when the State provides 'significant encouragement, either overt or covert,' or when a private actor operates as a 'willful participant in joint activity with the State or its agents.'" (citations omitted)); *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) ("[I]t is also axiomatic that a state may not induce, encourage or

promote private persons to accomplish what it is constitutionally forbidden to accomplish." (quoting *Lee v. Macon Cnty. Bd. of Educ.*, 267 F. Supp. 458, 475–76 (M.D. Ala. 1967))). Under this view of the case, which Watts also argues, it is clearly established that Breed engaged in state action when he ordered his players to assault Watts.

The challenged action is Breed's order to hurt Watts. It is hard to see how that is anything other than state action. Breed was on the sidelines acting in his role as an assistant football coach at a public school. Just as a police officer cannot avoid the Fourth Amendment by ordering a private citizen to conduct an illegal search, *see Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971) (explaining that the Fourth Amendment applies when a private party is acting as an instrument or agent of the state), Breed cannot escape liability by ordering students to conduct the attack. Likewise, state officials could not get around the Equal Protection Clause on the ground that they did not "physically post the signs" in a bus terminal segregating the races. *Baldwin v. Morgan*, 287 F.2d 750, 755 (5th Cir. 1961). Because the state "commanded" the private terminal operator to post the signs and maintain separate areas, state officials could be sued. *Id.* As these examples show, a state actor is liable for conduct that also involves private actors "when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

In fact, the difficult state action question when a public official and a "nominally private" party act in concert is whether the latter temporarily becomes a state actor subject to constitutional constraints. *See Brentwood*, 531 U.S. at 296; *Blum*, 457 U.S. at 1003 (distinguishing cases "in which the defendant is a private party and the question is whether his conduct has sufficiently received the imprimatur of the State so as to make it 'state' action for purposes of the Fourteenth Amendment"); *see also Adickes v. S.H. Kress*

*& Co.*, 398 U.S. 144, 169–71 (1970) (addressing whether a private company could be sued under section 1983 for maintaining a segregated restaurant when state enforced custom of segregation).   The question with the straightforward answer is the one we face here: whether a public official somehow steps out of his ordinary "state actor" role by enlisting private parties to carry out his orders. *See Peterson v. City of Greenville*, 373 U.S. 244, 248 (1963) ("When the State has commanded a particular result, it . . . has 'become involved' in it, and, in fact, has removed that decision from the sphere of private choice.").  Because the law has long recognized that a public official remains a state actor when he orders others to carry out his objectives, any reasonable football coach would have known that he was engaged in state action when instructing his players that Friday night.  Consequently, the state action in this case was clearly established and it was error to dismiss the section 1983 claim against Breed on that ground.

Although we hold that Breed was engaged in state action that subjected him to the Due Process Clause, we do not opine on whether the complaint has alleged a violation of clearly established due process law.  We leave that determination to the district court on remand.  And because the only basis for dismissing the state tort claims brought against Breed was the dismissal of all federal claims, we also reverse the dismissal of the state claims.

We therefore AFFIRM IN PART and REVERSE IN PART. The case is REMANDED for further proceedings on the claims asserted against Breed in his individual capacity.